**UNITED STATES of America,
Plaintiff,**

v.

**Boyd L. WEHRBEIN, Jr., Defendant.**

**No. 4:98CR3050.**

United States District Court,
D. Nebraska.

Aug. 31, 1999.

William W. Mickle, II, Assistant United States Attorney, Omaha, NE, for plaintiff.

John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The State of Nebraska and the United States of America prosecuted Boyd L. Wehrbein, Jr., (Wehrbein) twice for very similar conduct that arose out of the same event.[1] As a result, the defendant served time in a state prison. After he was released from that prison, the federal government prosecuted the defendant again. The case was referred to the United States Attorney while the defendant was in state custody. Allowing more than a year to pass, the government waited until the de-

---

1. The federal prosecution did not violate the law. *See, e.g., United States v. Arena,* 180 F.3d 380, 399–400 (2nd Cir.1999) (state and federal prosecution of abortion clinic attackers did not violate Double Jeopardy Clause or government's policy regarding dual prosecutions where state sentence only amounted to probation; a "federal prosecutor may, in deciding whether to pursue a subsequent prosecution, take into consideration what he deems an 'inadequate result' obtained in the state trial.") (citation omitted).

fendant left the state prison to indict him on the federal charges.

The defendant's child, Christopher, who has a serious emotional disorder, will be significantly harmed if his father is imprisoned a second time. The boy has just begun to overcome the disastrous impact his parents' neglect and the first imprisonment has had on the child. The presence of his father is critical to the boy's continued improvement.

Wehrbein requests that I depart from the Guidelines. I will grant his motion for departure under U.S.S.G. § 5K2.0 (p.s.). My reasons for this ruling are set forth below.

## I. BACKGROUND

In the Fall of 1996, Wehrbein, then age 32, and his wife, Christine, then age 27, had hit bottom. They were both addicted to methamphetamine, marijuana and alcohol. Their addiction was wildly out of control.

They had three children whom they neglected badly. The children's names are: Boyd Lee Wehrbein, III, now age 12, Christopher S. Wehrbein, now age 11, and Jessica J. Wehrbein, now age 9. Everyone agrees that all three children suffered great emotional trauma at the hands of their parents. For example, when the defendant and his wife wanted to use their drugs, the couple would lock the children (then ages 9, 8 and 6) out of the home.

### The Search

On October 17, 1996, after a search warrant was executed at the defendant's home in Beatrice, Nebraska, officers located a pint can of acetone and two gallon cans of naphtha. In the living room of the residence, officers located a lock box with razor blades and syringes and various papers entitled "Boyd's notes," which appeared to be the recipe for making methamphetamine. Officers also found a bottle of iodine crystals, a ziplock baggie of iodine crystals, a quart bottle of acid, a quart can of acetone, a cardboard box with baggies containing red phosphorus, two 1,000 milliliter glass beakers, a 2,000 milliliter beaker and two gallon jugs containing an unknown liquid. In the kitchen of the residence, officers located approximately 64 ounces of marijuana, three gallon-sized jugs of liquid labeled "shit," and two jars of red phosphorus.

Also found in the residence was a Stephens model 520 shotgun with a barrel of less than 18 inches, a Sears model 130 × 30 rifle, a H & R 410 shotgun, a Remington model 522 22–caliber semi-automatic rifle, a Mossburg model 512 gauge shotgun, a Whitney 22 caliber revolver and a Smith and Wesson 357 magnum revolver. The short-barreled shotgun had been cleaned and appeared to be in working condition when it was discovered.

The officers also found Christine and the three children in the home. The house was filthy. The children's clothes were soiled to the point that they had to be destroyed rather than cleaned.

### The State Charges

As a result of the search, Wehrbein and his wife were prosecuted in Nebraska state court. Although the record is not entirely clear, it appears that Christine was prosecuted on a low-grade marijuana charge and she was placed on probation. She did little or no time in jail.

The defendant, however, was charged with and convicted of more serious crimes. He was charged with unlawful manufacture and distribution of a controlled substance (Count I), possession of marijuana, more than one ounce but less than one pound (Count II), possession of a short shotgun, amended to attempted possession of a short shotgun (Count III), and child abuse (Counts IV – VI). Pursuant to a plea agreement, Count I, pertaining to the unlawful manufacture and distribution of a controlled substance, was dismissed. Wehrbein pled guilty to the remaining five counts. On January 24, 1997, he was sentenced to the Nebraska Correctional Center. He received a maximum sentence of 31 months in prison. (Presentence Report (PSR) ¶ 55.) He was discharged from the

Nebraska prison on March 2, 1998, after serving about 13 months.[2] (PSR ¶ 2.)

## The Children Are Separated

After Wehrbein and Christine were arrested, Nebraska Child Protective Service case managers took the children and placed them with relatives. The children were split up. Christopher resided with his paternal grandfather, Boyd Wehrbein, Sr., in Nebraska.[3] The other two children resided with their maternal grandparents in California. These arrangements lasted for approximately one year.

Insofar as Christopher was concerned, he was placed in Nebraska, and separated from his siblings in California, so he could receive more individual attention in school and be closer to his parents. There were two concerns. First, it was feared that Christopher suffered from attention deficit hyperactivity disorder and it was thought that a small-town school might be able to provide a better environment for the boy. In addition, Christopher also expressed a very strong desire to be close to his parents. As will be seen later, Christopher is particularly dependent upon his father.

## Christine Seeks Treatment, But Wehrbein Rejects Help

Thankfully, the State of Nebraska intervened to try to rehabilitate the family. This began when both Wehrbein and his wife Christine were interviewed by Nancy Probst in January of 1997. Ms. Probst is employed at the Blue Valley Mental Health Center in Beatrice, Nebraska. She is a certified alcohol and drug abuse counselor, which is the highest ranking for such a speciality in the State of Nebraska. In addition, she supervises several counselors and the mental health center. Probst interviewed the defendant and his wife pursuant to an order from a state court judge who was handling the child welfare case.

Insofar as Christine was concerned, Probst determined that Christine was in need of extensive treatment. Christine was amenable to treatment. She told Probst that she would do anything she could to put her family back together. The evidence indicates that she has done this.

Shortly after Probst interviewed Christine, she also interviewed the defendant. He was "very arrogant, very cocky, had no remorse." (Ex. 211 at 20.) Wehrbein told Probst that "he didn't think he needed to be there and it was a waste of time." (*Id.*) At that time, Probst thought there was little chance that the defendant would change.

Based upon Probst's recommendations, Christine Wehrbein agreed to enter the inpatient drug treatment program at the Hastings Regional Center in Hastings, Nebraska. She went to that facility and stayed there for approximately 40 days. Prior to her going to the Hastings Regional Center, she was living in a safehouse for the homeless.

After successfully completing her treatment at the Regional Center, Christine contacted Probst for aftercare services. By that time, Christine was residing in a motel in Beatrice, Nebraska. Because Christine did not have transportation, she walked to the meetings. Probst was Christine's primary counselor for the aftercare program. Christine received intensive aftercare treatment from April of 1997 through December of 1997.

When Probst first met with Christine, she was homeless, jobless, her children had been taken from her and her addiction was uncontrolled. Throughout the course of the next year, Christine successfully sought treatment for her drug and alcohol addiction, gained employment (at a Burger

---

2. It is likely that Wehrbein actually served more than 13 months in jail or prison since he was arrested in October of 1996 and not released from prison until March of 1998. The record does not reflect how much time he spent in jail as a pretrial detainee.

3. After Christopher was reunited with his parents, Mr. Wehrbein's wife died and he moved to California.

King) and rented a home. By the end of the year, she also had custody of her daughter. She later obtained custody of her two sons.

### The Defendant Is Released from State Prison

Wehrbein got out of prison March 2, 1998. Probst saw Christine on April 14, 1998, after Wehrbein had been released from prison. Probst characterized this as an "emergency session" because Christine was so frustrated. Although Wehrbein had obtained a high school diploma while in prison, and had experience as a welder, he had not yet found a job. Moreover, the children were having behavioral problems, and the State of California was demanding that she pay back monies that she had received on behalf of the children. Even though very frustrated, Christine reported that both she and the defendant were sober and both were attending AA or NA meetings. She and Probst made plans about how to deal with Christine's concerns.

Thereafter, the defendant found good work as a welder. His employer told the United States probation officer handling this case that the defendant is a "[v]ery good employee. Does exactly what [the] supervisor tells him to do. Gets along very well with other employees. Is very prompt. Always on time and works a 45 hour week." (PSR ¶ 90.)

It now seemed that the defendant and his family had a chance to begin life anew. Christine had received extensive drug treatment, and she had found a home and a job. Wehrbein had done his prison time, earned his high school diploma, and was gainfully employed with a good job. Both parents were attending "12–step" meetings. Christine had Probst, the counselor, to lean on. The children had been reunited with their parents.

### The Delayed Federal Prosecution

Unknown to the Wehrbein family, the authorities were not satisfied with the 13 months in prison that Wehrbein had served. Accordingly, law enforcement authorities referred the case to the United States Attorney for the District of Nebraska for federal prosecution on March 21, 1997. (Tr. 208–209.[4]) Despite the fact that the federal authorities received the case for prosecution in late March of 1997, while the defendant was in the state prison, the prosecutors did not obtain an indictment against him until June 18, 1998. By that time, Wehrbein had been out of the state prison for about three months. The prosecutors have not offered any explanation why the government waited more than 14 months to bring charges against Wehrbein even though they knew he was in prison and they had an open and shut case. (E.g., Filing 67 (Sentencing Transcript) at 14.)

The four-count indictment was based upon evidence found as a result of the October 17, 1996, search of the home. In Counts I through III the defendant was charged with possession of equipment or chemicals used to manufacture methamphetamine. In Count IV, he was charged with possession of a firearm while being an addict. All offenses were alleged to have taken place on October 17, 1996.

Wehrbein was arrested on June 25, 1998, on a warrant issued by this court. He was held in custody until June 29, 1998, when he was released pursuant to an order setting conditions of release. At the direction of the United States pretrial services officer handling this case, Wehrbein obtained a substance abuse evaluation on July 7, 1998. That assessment recommended intensive outpatient treatment for Wehrbein. Wehrbein did not immediately

---

**4.** The transcript references ("Tr.") are to an unedited "real time" transcript of the second evidentiary hearing held on August 3, 1999, prepared by the court report for my use. It may differ slightly from the final edited version. Contemporaneous with the filing of this opinion, I have also filed the transcript to facilitate appellate review should that become necessary.

seek intensive outpatient treatment, however.

The family was shocked by the indictment. They did not understand why the defendant should go back to another prison after having served time in the first one. These new federal charges came just as the family was beginning to put their lives back together.

With the assistance of the able assistant federal public defender assigned to this case, the defendant negotiated a plea agreement with the government. Wehrbein signed a plea agreement in which he agreed to plead guilty to Counts I and IV of the indictment and cooperate with the authorities in any ongoing narcotics investigation. In exchange, the government agreed that Counts II and III of the indictment would be dismissed at the time of sentencing. In particular, the parties stipulated that the defendant's base offense level for Count I should be 12, while the base offense level for Count IV should be 14.

The government advised the probation officer that the total quantity of methamphetamine that the defendant "manufactured, or which was potentially able to be manufactured totaled less than 5 grams." (PSR ¶ 18.) Thus, while Wehrbein was addicted to the methamphetamine that he made and sold, he was only a bit player in that awful trade.

### The Presumptive Sentence Is Much Higher Than Anyone Anticipated

The probation officer grouped Counts I and IV together under U.S.S.G. § 3D1.2(c). In calculating the offense level of Count IV, the offense conduct of Count I was treated as a specific offense characteristic. Under U.S.S.G. § 3D1.3(a), the higher of the two offense levels was used to determine the defendant's offense level. Then, both offenses were separately calculated and the base offense level resulting in the highest offense level was used to determine the defendant's total offense level. Count IV provided the highest total offense level.

Count IV dealt with Wehrbein's possession of a weapon while being an addict. Applying the Guidelines and the specific offense characteristics, the base offense level was 20 (PSR ¶ 38) and the adjusted offense level for Wehrbein was 26. (PSR ¶ 44.) Reducing the adjusted offense level by three points for acceptance of responsibility, Wehrbein was found to be at total offense level 23. (PSR ¶¶ 45 & 49.) In arriving at this calculation, the probation officer considered all the weapons in the home, including the "short shotgun" that had formed the predicate for one of the state court convictions. In fact, the probation officer specifically increased the base offense level to 20 because of the short shotgun. (PSR ¶ 38 citing U.S.S.G. § 2K2.1(a)(4)(B).) This was six levels higher than the government had agreed was correct.

The probation officer also found that Wehrbein was in criminal history category III. At age 23, Wehrbein had received a 90–day jail sentence and three months probation for grand theft. (PSR ¶ 52.) He also received a 12–day jail sentence plus two years probation for possession of an illegal weapon when he was 28. (PSR ¶ 53.) These convictions resulted in three points being assessed against the defendant.

The probation officer additionally increased Wehrbein's criminal history by three more points. The officer did this based upon the child abuse convictions that stemmed from the October 17, 1996, search warrant execution. The probation officer reasoned that the child abuse was not a part of the instant offense and, therefore, the child abuse convictions were to be counted as prior convictions.

Thus, notwithstanding the fact that the government had agreed that Wehrbein's base offense level should not exceed 14, the probation officer found that Wehrbein's base offense level was 20, his adjusted offense level was 26, and his total offense level was 23 (after giving him three points for acceptance of responsibility),

plus his criminal history category was III. (PSR ¶ 101.) This translated to an imprisonment range of 57 to 71 months in prison.

## On New Years Eve, Wehrbein Gets Drunk

On January 1, 1999, Wehrbein drank alcohol, drove his car, and received a citation for driving while under the influence of alcohol. Since it was a condition of his pretrial release that he abstain from alcohol, he was arrested and detained.

Nancy Probst, who had seen Wehrbein two years earlier in 1997, saw Wehrbein again on January 12, 1999, at the request of the federal public defender. She wrote a glowing written assessment comparing what she had observed in 1997 with what she observed in 1999:

> It was a pleasure to see the total attitude adjustment that Mr. Wehrbein presented throughout this whole interview. He seemed very open and honest and answered all questions completely. He maintained good eye contact and acknowledged several times throughout this assessment that he also remembered his defense and defiant attitude at our first interview. Mr. Wehrbein showed humility in accepting his substance abuse addiction. He sees his substance usage as a problem which he will have to work on for the rest of his life. At this time, he seems willing to put forth the effort to regain total abstinence from all mood altering chemicals. He also was willing to participate in any program recommended from this assessment.

(PSR ¶ 84.)

Probst recommended, and this court ordered, that Wehrbein attend an intensive outpatient program for the treatment of substance abuse. As a result, he was released to pursue that treatment. As will be seen, Wehrbein followed the court's order and did very well.

## The Presumptive Sentence is Reduced

Wehrbein objected to the presentence report. He strenuously argued that the PSR violated the plea agreement because it imposed a base offense level of 20 and that level substantially exceeded the stipulated maximum base offense level of 14. Wehrbein also lodged a series of other objections to the calculations set forth in the presentence report.

Initially, I addressed Wehrbein's claim that he was entitled to force the court to adopt the parties' base offense level stipulation in the plea agreement. I denied his motion, finding that the plea agreement had not been made in accordance with Fed.R.Crim.P. 11(e)(1)(C). Consequently, I found that neither the probation officer nor the court were bound by the stipulation of the parties, even though the court had otherwise accepted the plea agreement.[5] See U.S.S.G. § 6B1.4(d).

After a careful analysis of Wehrbein's claims, I sustained in part and denied in part Wehrbein's objections to the presentence report. Among other things, I concluded that the probation officer's calculations with regard to Count IV were correct and that Wehrbein's total offense level was in fact 23. However, with regard to the calculation of criminal history, I found that Wehrbein's child abuse conviction was inextricably related to the other conduct. I reasoned that it was the entire conduct on October 17, 1996, that formed the predicate for the state and federal charges.

Accordingly, I found that the defendant's criminal history must be reduced by three points because the state court convictions for child abuse should have been considered as "conduct [that is] part of the instant offense" and, therefore, was not countable within the meaning of U.S.S.G. § 4A1.2(a)(1). Alternatively, I indicated that the criminal history category would overstate the seriousness of the defendant's prior criminal history, even if the

---

5. Although I denied Wehrbein's motion to enforce the plea agreement, I gave him leave to withdraw his guilty plea. Despite this opportunity, he elected to stand on his guilty plea notwithstanding my rulings.

criminal history score had been properly calculated. Consequently, I tentatively ruled that the defendant's total offense level was 23 and his criminal history category was II.

I also gave notice that I intended to depart from level 23 to level 17 to account for the fact that the short shotgun formed the basis for punishment in the state case and because six levels had been added to the defendant's base offense level under Count IV for possession of that same gun in this case. I concluded that, although the defendant had discharged his state court prison sentence, by analogy to U.S.S.G. § 5G1.3, I should not punish the defendant twice for the same weapon. *See, e.g., United States v. Kiefer*, 20 F.3d 874, 876–77 (8th Cir.1994) (district court had discretion to reduce sentence below mandatory minimum to account for time already served on related state court conviction).

At a level 17, criminal history category II, Wehrbein faced 27 to 33 months in prison. While my ruling reduced the presumptive sentence calculated by the PSR, Wehrbein still faced more than two years in prison. This, of course, would be in addition to the 31–month maximum sentence he received in state court for which he already had served 13 months. What was worse, his family would be torn apart again.

### The First Evidentiary Hearing

As he had a right to do under our rules, Wehrbein objected to my tentative findings. He also objected to my ruling that the plea agreement did not set the base offense level. The government, in contrast, did not object to my tentative findings or my ruling on the plea agreement. Nor did the government challenge the six-level departure to offense level 17.

In addition to his objections, Wehrbein filed a motion for departure. In that motion, Wehrbein alleged that there were four factors that justified departure under U.S.S.G. § 5K2.0 (p.s). The first factor was that Wehrbein had served a state sentence arising from essentially the same conduct that gave rise to the federal sentence. Second, Wehrbein alleged that the trauma to his family would be excessive if he were to be incarcerated again. Next, Wehrbein alleged that he had a history of gainful employment. Finally, Wehrbein alleged that the unique circumstances of his case, taken together, warranted a departure.

Thereafter, an evidentiary hearing was scheduled on the defendant's objections to my tentative findings, his motion for departure, and his motion to enforce the plea agreement. These matters came on for hearing on June 11, 1999.

After once again considering Wehrbein's motion to enforce the plea agreement, I concluded, as I had done before, that the stipulation and plea agreement regarding the offense levels entered into by and between the defendant and the government was not binding upon the court. *United States v. Wehrbein*, 61 F.Supp.2d 955 (D.Neb.1999). I also denied Wehrbein's objection to my tentative findings.

We then began to take testimony on the departure motion. Nancy Probst, the drug counselor, who had extensive experience with both Wehrbein and Christine in the past, was called by the defense.

She testified about Wehrbein's progress between the time she had first seen him in 1997 and his progress following completion of the intensive outpatient treatment program in the Spring of 1999. Probst stated, and the record confirms (Ex. 202), that Wehrbein successfully completed the intensive outpatient alcohol and drug program at the Blue Valley Mental Health Center in Beatrice, Nebraska. This intensive program consists of an assessment, along with 60 hours of group therapy and educational presentations. Wehrbein continues to participate in an aftercare program, also provided by the Blue Valley Mental Health Center. The aftercare group meets one time per week for a period of one hour. He also attends an AA or NA meeting at least once a week.

Probst characterized Wehrbein's progress as extraordinary. (Ex. 211 at 58.) On cross examination, the prosecutor stated that "there's really nothing extraordinary in your opinion as to whether or not [Wehrbein's progress] stands out from any other client or patient." (*Id.* at 51.) Probst adamantly disagreed. She said that "given when I met with him in 1997 I would say it's an outstanding progress for Mr. Wehrbein to be where he's at today." (*Id.*)

Probst then turned her attention to the impact that Wehrbein's incarceration would have on Christine. She also testified about what she and the other counselors at the Blue Valley Mental Health Center believed would be the impact upon Wehrbein should he be incarcerated.

Probst testified that "if the family system is interrupted, I would place her (Christine's) relapse [risk] as high." (Ex. 211 at 39.) By "interruption" Probst meant if the defendant went to prison a second time. (*Id.*) Insofar as the defendant was concerned, Probst testified that "he's also at a very vulnerable stage." (*Id.*) If "he would go to prison . . . it would put him at high risk, because he would be back in the environment and with the people that have sort of . . . the same attitude that he had when he first came in for his assessment [in January 1997]." (*Id.* at 40.)

During the testimony of Probst, it became apparent that the impact of Wehrbein's imprisonment might be unusually severe on his children. I ruled, however, that Probst was not competent to express an opinion on that subject. Accordingly, I gave the parties an opportunity to engage experts, and I continued the hearing. I made a suggestion to both lawyers that they hire one truly competent and objective expert who would have the children's interest at heart:

> What I would suggest is you go together and hire one competent child psychologist. The two of you sit down and agree and then go to this person, him or her, and say, you know, this is not a matter of advocacy. We really want to know if

we have especially vulnerable children here who are going to be unduly harmed by their father going to prison given the circumstances of this case.
> (*Id.* at 69.)

### The Second Evidentiary Hearing

Notwithstanding my suggestion that the opposing lawyers hire one expert who would endeavor to answer the question whether the Wehrbein children were "especially vulnerable children . . . who are going to be unduly harmed by their father going to prison," the lawyers could not agree. This was disappointing at best since the resulting "battle of the experts" might tend to cloud, rather than clarify, the situation.

On August 13, 1999, I took the testimony of the two experts. I also received other evidence on the impact that Wehrbein's imprisonment would have on his children.

### The Psychological History of the Children

Both of the experts explored the children's psychological background in great detail. This information was primarily developed by reviewing school records, including reports from consulting psychologists. The evidence revealed that the oldest boy, referred to as Boyd III, has been diagnosed with a "specific learning disability" that requires special education. Christopher, the middle child, has been diagnosed as suffering from "a behavioral disorder" that also requires special education: Jessica, the youngest child, appeared to be doing well.

The following is a summary of Boyd III's school experience prepared by the government's expert which I find to be accurate:

> Boyd III will be starting in the 6th grade at Southern Elementary School in Blue Springs, Nebraska. He was retained in 5th grade as his parents and reportedly the teachers believed he had missed too much school and had too

many transitions in the 1997–1998 school year. His parents reported he has difficulty with reading, but that his grades had significantly improved as of the end of this past school year. Boyd III was in the 5th grade when he started at Southern Elementary on January 5, 1998. That semester he received incompletes and F's in Reading and Spelling, and D's in Arithmetic, Language, Science and Social Studies. However, he had no times absent or tardy.

Boyd III has an Individualized Educational Plan (IEP) with placement permission obtained and original IEP meeting held on September 2, 1998. The latest diagnosis from April 28, 1998 and an IEP Review was reportedly scheduled on or about September 1, 1999. He initially qualified to receive Resource Services from 9/2/98 to 9/1/99, and reportedly those have been continued to date. 99% of his time was to be scheduled attending regular classes with, at most, 1% of his time in special classes without regular peers. Boyd Wehrbein, III was evaluated on April 7, 1998 and April 28, 1998 by Michael C. Renner, Ph.D. with the Family Mental Health Clinic, P.C. in Beatrice, Nebraska. The final psychological report was dated June 9, 1998. On the Wechsler Intelligence Scale for Children—III Edition (WISC—III), he obtained a verbal IQ of 89, a performance IQ of 110, and a full scale IQ of 98. On the Kaufman Test of Educational Achievement (KTEA), Brief Form he obtained the following standard scores: Mathematics—76; Reading—85; Spelling—94 and Battery Composite—82. On the Woodcock–Johnson Psycho-Educational Battery (WJPEB) he obtained the following grade equivalents and standard scores: Reading—3.4, 83; Math—4.1, 81; Written Language—4.8, 92; Knowledge—6.8, 111 and Skills—3.3, 79. His achievement scores in reading comprehension and math calculation qualified him for a "diagnosis as a student with a specific learning disability in the areas of reading comprehension and math calculation." Boyd III was noted

by members of the multidisciplinary team to display "difficulties in doing work activities on a 5th grade level and being able to complete a task at a deadline and has trouble in following directions and using time wisely. He seems to display poor work study skills and poor organizational skills and some immaturity and seems to be frequently tired and fatigued." Teachers indicated he had difficulty working independently, getting work done on time, participating in large groups, being sure of himself and making decisions. The test results from April, 1998 indicated a discrepancy between Boyd's overall ability and his daily performance achievement in the classroom in the areas of basic reading skills and math calculation. He struggled with being able to work independently in any subject area and often did not follow through with completing homework. The goal was to provide services using the Class–Within–A–Class model. He was to use a daily assignment notebook to help him keep organized with homework, and it was stated he was in need of a great amount of positive encouragement to build his self-confidence. "Boyd is a very friendly, cheerful young man ..., He is extremely polite and is beginning to build some peer relationships."

This past school year he was retained in the 5th grade and obtained one F the first semester, while achieving primarily C's and D's throughout the year. He was absent nine times and had no times tardy. Boyd III improved throughout this time period as the number of areas checked as needing improvement declined from May 1998 to May 1999. By the end of the latest quarter of this past school year he had no areas checked as needing improvement, whereas before he was noted to have problems in working neatly and carefully, listening and following directions, beginning and finishing work promptly, effort and accepting responsibility for his behavior. The Special Services Program Summary for

1998–99 School Year reported that in the 1st quarter Boyd III had a difficult time readjusting to school. Teachers worked with him on organizational strategies. In the 2nd quarter he struggled academically, especially with Reading. In the 3rd quarter he fell behind when he was "sick."

(Ex. 1 at 6–7.)

The following is a summary of Christopher's school experience prepared by that same expert and I find it to be accurate as well:

Christopher has attended Southern Elementary in Blue Springs, NE since January 5, 1998 when he started in the second semester of fourth grade. That semester he obtained three D's, two C's, and one F. He was absent three days and had no times tardy. This past school year he obtained mostly A's and B's, except C's in Social Studies and one C in Reading. He was absent five days and again had no times tardy. He was given midrange ratings in the Personal Adjustment Rating. He had a psychological evaluation done by Michael C. Renner, Ph.D. with the Family Mental Health Clinic, P.C. in Beatrice, Nebraska on March 24, 1998 and March 31, 1998 with the final report completed on June 9, 1998. On the WISC—III he obtained a verbal IQ of 97, a performance IQ of 110, and a full scale IQ of 103. On the KTEA, Brief Form he obtained the following standard scores: Mathematics—93, Reading—84, Spelling—98, Battery Composite—90. On the WJPEB he obtained the following standard scores: Reading—86, Math—96, Written Language—90, Knowledge—84, Skills—86. On the Achenbach Child Behavior Checklist, he obtained elevations of greater than two standard deviations from average in the areas of withdrawn behavior and social problems. Teachers indicated Chris "seems very insecure and unable to attend to class activity. Reading is hard for Chris but he tries. At times, he seems to demonstrate depressive traits." "He is described as a friendly boy who wants to do well. Chris often times doesn't finish his work on time although he has made some improvements in this area." "It was noted by members of the multidisciplinary team that Chris has difficulty in concentration, focusing his attention and staying on task and these difficulties may be related to aspects of depression, anxiety, social withdrawal and social introversion and a tendency to hold in his thoughts and feelings." "It was the consensus of the multidisciplinary team that Chris does demonstrate patterns of situationally inappropriate behavior which deviate substantially from the behavior of his age group with frequency, intensity and duration in terms of the ability to concentrate, focus his attention and stay on task and that these inappropriate behaviors significantly interfere with his educational performance. IT was therefore the consensus . . . that Chris qualifies for diagnosis as a student with a behavioral disorder." Chris was placed on an IEP on April 28, 1998 with the IEP review scheduled for on or about April 27, 1999. He was provided with a Class–Within–A–Class model Resource room with up to 1% of his time in Special Classes without regular peers and 99% of his time in Regular Class with peers. Page 2 of the IEP reported, "In the classroom, Chris is very quiet, and easily drawn off-task. He has a lot of difficulty using his time wisely and therefore often doesn't get his work completed. Reading and language arts are difficult for Chris, and he also shows very little interest in his peer relationships." "Chris is an extremely sweet, likable young man. He really wants to please adults and seems to want to do well." The 1998–1999 School Year Summary for the Special Services Program stated Christopher in the first quarter "has gotten off to a super start! He is really developing some confidence and making super progress on our goals." There were similar comments for 2nd and 3rd quarters.

Christopher also had a psychoeducational evaluation completed by school psychologist, Louise Ferre, Ph.D., on November 8, 1996 in the Lewiston School District of Nebraska and he was diagnosed as having a specific learning disability as he was found to possess average general intellectual abilities but had significant underachievement relative to his assessed ability in the areas of math computation, written expression, basic reading skills, math reasoning, listening comprehension and oral expression. Specifically, he was given this diagnosis because there was a 1.3 standard deviation deficit between his current assessed intelligence and performance in math computation, written expression. He completed the Child Depression Inventory with a score within the average range. He expressed concerns about his parents being in jail. On the Child Anxiety Scale he had a low score of 24% which could be indicative of a highly anxious child using denial as a mechanism of defense. On the Roberts Apperception Test he indicated that his sister and brother had died which may have related to their living with the maternal grandparents in California and Christopher being worried at the time that he may not see them again. On the Reliance on Others scale he was unable to indicate any figures in his environment that he could rely on. On the Limit Setting scale none of his responses indicated any limit setting had occurred consistently at home. His responses to questions of the Anxiety scale reflected some levels of anxiety. His responses to the Depression scale questions often reflected sadness and despair. On the Unresolved [scale] many of his responses did not contain resolutions to problems.

(*Id.* at 7–8.)

The following is a summary of Jessica's school experience which was also prepared by the government's expert that I now adopt:

Jessica started attending Southern Elementary in Blue Springs, Nebraska on 8/20/97, at which time she was beginning second grade. That school year she made all S's and S+'s, except for one U in Penmanship in 1st semester. In the third grade she obtained mostly B's, with one C+ in Arithmetic. She was absent a total of zero days in the second grade and six days in the third grade, with no times tardy either school year. She received two's and three's on a five point scale for Personal Adjustment Ratings with one being the highest level.

(*Id.* at 8.)

### The Defense Expert

The defense called a highly qualified expert in forensic psychology with extensive experience in the area of child psychology. His name is Mario J. Scalora. Scalora holds a Ph.D. in psychology and he is on the faculty at the University of Nebraska. He is affiliated with both the clinical and law-psychology training programs at that institution.

Scalora was a postdoctoral fellow in forensic psychology at the University of Massachusetts medical center. As a postdoctoral fellow, he performed assessments of children and adolescents concerning issues such as amenability to treatment, child custody, parental competence, potential for violence or escape, competency to stand trial, criminal responsibility and competency to give informed consent. He also taught medical students and psychiatric residents seminars related to forensic mental health issues.

Scalora has been awarded various grants and consultancies as a result of his speciality. Two examples will illustrate the breadth of his experience with children similar to the Wehrbein siblings. He received a grant from the National Institute of Health to evaluate a demonstration project providing services to delinquent and at-risk youth. Together with Dr. Patricia Sullivan of Boys Town and Dr. John Knutson of the University of Iowa, Scalora received a grant to determine the impact

of abuse on the subsequent functioning of children. Both of those grants are now in progress.[6]

Scalora also currently serves as a consultant and evaluator at the Lincoln Regional Center, which is a state mental hospital. There he performs forensic evaluations and supervises graduate students providing treatment and assessment services at the Forensic Unit and the Adolescent and Family Services Unit.

Scalora has published many scholarly papers. He has also been president of the Nebraska Psychology Association.

Of the two experts called by the parties, Scalora spent more time with the family members than did the prosecution expert. While both experts were surely competent, Scalora's opinions were the most persuasive. This is primarily because he spent more time on this assignment and his testimony was the most consistent with the testing that had been performed on the children by various other mental health professionals.

Scalora first saw the Wehrbein family on July 9, 1999. He met with them in his offices in Lincoln, Nebraska. Initially, he met with the defendant and Christine. He then met with the entire family. Then he sent various testing materials home for the parents and the older children to complete. Thereafter, on July 24, 1999, he traveled to Wymore, Nebraska, and met with the family in their home. After that, he met with each child individually.

Scalora's testimony was broad-ranging. Scalora had reviewed a video tape of the October 17, 1996, search of the Wehrbein family home. He was thus able to contrast the Wehrbein family home in October of 1996 with the family home in July of 1999. He found no comparison between the two. The earlier home was "abominable," while the later one was orderly and clean.

Scalora then described the various testing devices that he had given the family to complete. The BASC and the IBERG were completed by Wehrbein and Christine. The Achenbach Child Behavior Check List was given to the two older children. According to Scalora, the test results from these instruments were consistent with the testing that had earlier been done by two consulting psychologists with doctoral degrees. Among other things, that testing revealed significant indications of depression and anxiety in the children, although there had been recent improvement after Wehrbein had been reunited with the family.

Scalora believed that "this family has undergone significant positive changes since the parental arrests in 1996" and the "children now have a reasonable level of stability in their lives after great disruption." (Ex. 207 at 9.) With "regard to the defendant in particular, the children describe an emotionally involved and more patient parent who avoids physical punishment while maintaining limits upon the children's behavior." (*Id.*) In fact, as between Christine and the defendant, Wehrbein is the most competent disciplinarian. He was the "most active in [providing discipline], tending to be the most consistent and the one[ ] mainstaining rules." (Tr. 43.)

"Despite the children's improvement, they remain at-risk for significant emotional and behavioral difficulties given their special needs resulting from past trauma and previous history." (Ex. 207 at 9.) Because of that past trauma, all three children "are vulnerable to stressors that can disrupt this stability critical to their development." (*Id.*) Accordingly, Scalora believed that Wehrbein's second incarceration could "be quite a destabilizing influence upon all three children." (*Id.*) This impact would be more extreme if Christine Wehrbein "were to [attempt to] raise these

---

**6.** Scalora is also a consultant to the Nebraska State Patrol regarding the development, and empirical validation, of a risk-assessment measure to be used during implementation of the recently passed Nebraska Sex Offender Community Notification Act.

children alone" because she "requires her husband's assistance to a large degree with supervision and discipline." (*Id.*) Christine's inadequacy is a special problem because all the grandparents have moved to California and none are available locally to provide support to Christine and the children. (Tr. 70.)

While all three children were in danger for significant emotional and behavioral difficulties should their lives be disrupted, Christopher was most at risk. According to Scalora, in the previous testing, the reports of his parents and in the child's self-report, there is a consistent pattern of anxiety, depression, nervousness and agitation exhibited by the boy. For example, in the Spring of 1998, Christopher was tested over two days by Michael C. Renner, Ph.D. The results showed consistent evidence of clinically significant problems with depression and anxiety.

On the Achenbach Child Behavior Checklist, he obtained elevations of greater than two standard deviations from average in the areas of withdrawn behavior and social problems. (Ex. 1 at 7.) Teachers indicated that Christopher "seems very insecure and unable to attend to class activity." (*Id.*) "It was noted by members of the multidisciplinary team that Chris has difficulty in concentration, focusing his attention and staying on task" and it was suggested that these difficulties flowed from "depression, anxiety, social withdrawal and social introversion and a tendency to hold in his thoughts and feelings." (*Id.*) "It was the consensus of the multidisciplinary team that Chris does demonstrate patterns of situationally inappropriate behavior which deviate substantially from the behavior of his age group" and Christopher's inability to "concentrate, focus his attention and stay on task ... significantly interfere with his educational performance." (*Id.*)

The Spring of 1998 testing results were consistent with results obtained by Louise Ferre, Ph.D., in November of 1996. (*Id.* at 8.) Dr. Ferre also diagnosed Christopher as disabled. She indicated that his testing responses "could be indicative of a highly anxious child" who was "unable to indicate any figures in his environment that he could rely on." (*Id.*) For example, "[h]is responses to the Depression scale questions often reflected sadness and despair." (*Id.*)

As a result of Scalora's review of the historical information, the testing that Scalora administered and his interviews with the family and Christopher, the doctor diagnosed Christopher as suffering from attention deficit hyperactivity disorder according to the criteria established for that disturbance in the DSM–IV. (Tr. 32–35.) *See Diagnostic and Statistical Manual of Mental Disorders* at 78–85 (4th ed.1994). This mental illness can be serious: "In its severe form, the disorder is very impairing, affecting social, familial, and scholastic adjustment." (*Id.* at 81.) Children with this illness tend to have a history of such things as "child abuse or neglect" or "drug exposure in utero." [7] (*Id.*) Dr. Scalora recommended that Christopher be taken to a physician so that consideration could be given to placing the child on medication to deal with this disorder. (Tr. 60.)

Scalora had also received information from a grandparent that Christopher had spoken of suicide when he was separated from his father and mother. He pursued this concern with Christopher and the child "admitted he felt like hurting himself at the time." (Tr. 39.) [8] In general, Christopher did not want to talk about the

7. The record indicates that Christine was abusing drugs when she was pregnant with Christopher. (Ex. 210; "Christopher's mother ingested crack cocaine while she was carrying him.")

8. That Christopher was thinking about death after having been taken from his family is corroborated by Dr. Ferre's discovery in November of 1996 that "on the Roberts Apperception Test he indicated that his sister and brother had died which may have related to their living with the maternal grandparents in California and Christopher being worried at the time that he may not see them again." (Ex. 1 at 8.)

subject. The child was particularly apprehensive about the possibility that his father would be reincarcerated. In tears, Christopher told Scalora that the defendant is "quite helpful and supportive of him as well as [the] most capable of his care takers ... setting and enforcing limits" for the boy. (Tr. 40.) Without question, "Christopher is very attached to his father" and could not "bea[r] the notion of being without his father." (*Id.* at 38.)

Scalora indicated that any "significant disruptions in stability" for Christopher would cause a "significant likelihood" that the boy would suffer "behavioral difficulties" like "distractibility" and "more disruptive behavior." (Tr. 59.) His "depression[,] anxiety[,] nervousness would also be potentially bound to increase if there is any disruption in a structure of stability in this child's life." (*Id.*) This is an especially difficult problem for Christopher, since his "Attention Deficit Hyperactivity Disorder is best managed within a structured and consistent home environment." (Ex. 207 at 9.) "A serious disruption at this time could exacerbate problems with aggression, distractibility, and impulsivity." (*Id.*)

When I asked Scalora to place Christopher among a spectrum of 100 children ranging from reasonably well adjusted to maladjusted who were in the same family situation as Christopher, Scalora stated that the boy was in the top ten percent of at-risk children for internal difficulties (like depression) and within the top third of at-risk children for external difficulties (like disruptive behavior). (Tr. 117–20.) These percentiles were derived from the scores on the BASC instruments that had been completed by his parents.[9] (Tr. 121.)

### The Prosecution's Expert

The government employed Walter J. Duffy, M.D. He is a board-certified psychiatrist. Dr. Duffy received his psychiatry training at the Dwight David Eisenhower Army Medical Center and the Medical College of Georgia while he was an army doctor.

Duffy has extensive experience and training in the area of child psychiatry. He completed a fellowship in child and adolescent psychiatry at Fort Gordon, Georgia, in association with the Medical College of Georgia. He is board certified in that area. He was chairperson of the Army Research Work Group in Child and Adolescent Psychiatry. Duffy has been in private practice in Lincoln, Nebraska, since the Fall of 1998. He devotes all his time to child, adolescent and adult psychiatry.

He is a child and adolescent psychiatry consultant for the Bryan–LGH Health Systems in Lincoln, Nebraska. Bryan–LGH Health Systems operates the largest hospital in the area. In addition, he is a psychiatric consultant for an adult and adolescent dual diagnosis residential and day treatment center called CenterPointe. He is also a member of the American Academy of Child and Adolescent Psychiatry.

Duffy saw the Wehrbein family on July 16, 1999. He first saw Wehrbein and Christine together. Then he interviewed the children separately. Then he talked with the family together.

Dr. Duffy stated that the "defendant's three children do not have any significant current physical illnesses or limitations." (Ex. 1 at 15.) He also stated that none of the children had "any mental deficiencies." (Tr. 136.) He specifically disagreed with Scalora about whether Christopher suffered from attention deficit hyperactivity disorder because he did not think the record revealed a sufficient number of symptoms. (Tr. 172–78.) Furthermore, even if Christopher suffered from the disorder, it

---

**9.** This is a "normed" test, so the responses given by Mr. and Mrs. Wehrbein could be objectively compared statistically with results given by many other parents. (See, for example, Ex. 13, BASC Parent Rating Scale for Christopher, by the Defendant, at 4 (Normative Comparison and Comparison of Composite Scores).) Scalora found that the test results on the BASC, which has validity scales, were consistent with the prior testing that other psychologists had completed. (Tr. 22–23.)

would "not sway me in a large way one way or the other whether he's going to have an extreme emotional disorder." (Tr. 175.) While both Boyd III and Christopher "do have documented special education needs," they have "been improving in academic and social areas the longer they have been able to stay within one school system." (Ex. 1 at 15–16.)

Duffy, however, agreed with Scalora that Christopher "has had problems with withdrawn behavior, social problems, seeming insecure, attentional difficulties, depression, anxiety and a tendency to hold in his thoughts and feelings." (*Id.* at 16.) Duffy further acknowledged that Christopher "[is] at some risk of having future educational and emotional difficulties, which I believe are substantially associated with the lack of a stable, predictable, nurturing home environment" in the past. (*Id.* at 16.)

Nevertheless, Duffy concluded that none of the children "have serious physical or emotional problems" that could not be addressed adequately by Christine, the school system or relatives. (*Id.* at 16–17.) In particular, Dr. Duffy did "not believe there is substantive evidence showing that the Wehrbein children would experience extreme emotional distress should the defendant be incarcerated." (*Id.* at 17.)

Duffy was particularly skeptical of the assertion that Wehrbein's second incarceration might be especially harmful to the children. He expressed this doubt by pointing out two inconsistencies. First, neither the defendant nor Christine sought individual treatment for the children or counseling for the family. (*Id.* at 16.) Secondly, Duffy saw an inconsistency in Wehrbein's failure to seek intensive drug treatment until January of 1999. (*Id.*)

Still further, Duffy implied that the children had been "coached" and that the parents exaggerated the children's problems. As for "coaching," he observed that Boyd III used the phrase "double jeopardy" when talking with Duffy, and Duffy found that phrase indicative that the child had been influenced by his parents. (Tr.

139–40.) Next, Duffy noted that the responses that Wehrbein and Christine gave to Scalora's testing instruments were very similar, thus indicating an effort to skew the results. (Tr. 155–56.)

When I asked Dr. Duffy whether Christopher was clinically depressed when the doctor interviewed the child, he answered: "He did not have a Major depressive disorder . . . but I think he definitely had an adjustment disorder with some disturbance of emotions and . . . behavior. . . ." (Tr. 203.) Duffy added that "I think what has happened [regarding Christopher] is things have changed in his life, his behavior[,] his emotions[,] his school work ha[ve] all changed in a positive way as the stressors have been removed." (*Id.*)

### The Government Refuses to Accept the Appointment of an Independent Expert to Examine Christopher

As feared, the experts presented conflicting information, particularly about Christopher. As a consequence, and at the conclusion of the hearing, I suggested that the court was willing to "retain its own expert to look at Christopher." (Tr. 209–10.) I told the lawyers that I would not appoint an independent expert unless both parties agreed. It was the court's desire to appoint a person "who is without any question the best we can find." (Tr. 213.)

The parties agreed that the proposal might have merit. They asked for, and I agreed to give them, time to consider the question. The following week, Wehrbein's lawyer notified me that his client would accept the appointment of an independent expert to examine Christopher. Shortly thereafter, I was informed that the government would not agree to the appointment of such an expert. At sentencing, the prosecutor confirmed that under no circumstances would the government agree to the appointment of an independent expert. (Filing 67 at 3–4.)

## II. ANALYSIS

The Sentencing Guidelines permit a departure from the sentence otherwise required when there " 'exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. § 5K2.0 (p.s.) (quoting 18 U.S.C. § 3553(b)). However, a district court is not entitled to depart under the provisions of U.S.S.G. § 5K2.0 (p.s) unless it applies the analysis required by *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The Court of Appeals has described the process a district court must follow when applying *Koon. United States v. Woods*, 159 F.3d 1132, 1134 (8th Cir.1998) (affirming downward departure for exceptional charitable works). It described the process this way:

> Before departing from the Guidelines, a sentencing court first must determine whether a particular case presents features that "take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case." *Koon*, 518 U.S. at 95, 116 S.Ct. 2035, 135 L.Ed.2d 392. The court must then decide whether the Sentencing Commission has forbidden, encouraged, or discouraged departures based on those features. While a forbidden factor may not be used as a basis for departure, an encouraged factor may be considered if the Guidelines have not already taken it into account. A discouraged factor—or an encouraged factor already taken into account—may also be used as a basis for departure if the factor is present to an exceptional degree. If the factor is unmentioned, the sentencing court must consider the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," and decide whether the factor is sufficient to take the case

out of the heartland. *Id.* at 96, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (citing *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). The Commission specifically said that it did "not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

*Id.* at 1134.

It is noteworthy that the Supreme Court adopted Justice Breyer's methodology which he set out in *United States v. Rivera* while a Circuit Judge. *Koon*, 518 U.S. at 96, 116 S.Ct. 2035. In *Rivera*, the court reversed the refusal of the district court to consider a departure. There, the defendant was a single mother of three small children, who was sentenced to 33 months in prison for carrying a pound of cocaine from New York to Providence. Justice Breyer wrote that the district court should be "fully aware of its power to depart in 'unusual cases' and where family circumstances are out of the 'ordinary.' " *Rivera*, 994 F.2d at 953.

### The Features that Take This Case Out of the "Heartland"

I do not depart because Wehrbein's imprisonment will harm his wife, Boyd III or Jessica.[10] It is undoubtedly true that they would be harmed. However, the harm that they would suffer is not great enough to justify a departure, even given the government's failure to prosecute this case promptly. *See, e.g., United States v. Colbert*, 172 F.3d 594, 597 (8th Cir.1999) (affirming refusal to depart downward; the district judge's decision (holding that the effects of defendant's imprisonment on his three children and fiancee were not out of the ordinary) was not an abuse of discretion).

■ I acknowledge, however, that the departure question as it regards Boyd III

---

10. Nor do I depart because Wehrbein has done well in drug treatment or because he has been gainfully employed in the past.

While both factors exist in this case, neither one is sufficiently exceptional to justify a departure.

is a difficult call. He undisputably suffers from a serious learning disability and the second incarceration of his father is likely to make overcoming that problem more difficult. However, his disability is primarily cognitive and it is not a mental or emotional illness. Consequently, a responsive school system is likely to be able to help him deal with his cognitive problems, even in the absence of his father. Simply put, the treatment of Boyd III's cognitive deficits is not critically dependent upon a stable family unit as much as it is dependent upon a responsive school system. Since a responsive school system is likely to be found no matter who cares for Boyd III, a departure appears to be unwarranted in his case.

I do depart because of a combination of exceptional factors related to Christopher, and those factors are these:

(1) Christopher suffers from the major mental illness known as attention deficit hyperactivity disorder and he experienced great trauma at the hands of his parents before the first prosecution.

(2) During the first incarceration of his father, Christopher reacted very poorly and his illness was badly controlled. He spoke of suicide and imagined his siblings had died.

(3) Although far from perfect, Wehrbein has made significant strides at providing Christopher with a stable and structured home environment and the State of Nebraska has allowed Christopher to be reunited with, and dependent upon, his father.

(4) Because Christopher is especially dependent upon his father, there is a probability that his illness will flair if his father goes to prison a second time and the boy will be significantly harmed as a result.

(5) Christine is at high risk to relapse into drug and alcohol abuse if left as a single parent and, if that happens, she will be unable to provide Christopher with any structure, let alone the structure that only his father can provide.

(6) Christopher's attention deficit hyperactivity disorder requires the structured discipline that his father provides and his mother is incapable of providing.

(7) There are no longer any grandparents in Nebraska capable of providing support to Christine or capable of taking custody of Christopher, as one grandparent had done in the past.

(8) While the school system can provide Christopher with educational assistance, the boy's mental illness cannot be dealt with by the school alone because effective treatment of that illness requires a stable family structure, plus a consistent and strong disciplinarian like Wehrbein.

(9) The United States could have avoided, or at least ameliorated, the impact upon Christopher of another family disruption had it acted promptly to indict the defendant instead of waiting more than a year while the defendant was completing his first prison sentence.

In short, Christopher needs his father because of his mental illness, Christopher is likely to be significantly harmed if his father is not available to provide him with needed structure, there are no other competent caregivers who can provide Christopher with the critical assistance he needs and the government could have avoided, or lessened, the impact on this boy had it not been tardy in prosecuting Wehrbein a second time.

I emphasize that the government had the power to avoid this problem altogether. It "sat" on this case for more than a year while Wehrbein did his state prison time, even though the government knew where he was and intended to prosecute him when it got around to the task. Had it promptly prosecuted the defendant while he was in state custody, the defendant could have pled guilty to the federal charges while in state prison and done his federal time back-to-back with his state time.[11] Had that occurred, Christopher

11. To be clear, this factor is only relevant insofar as it harms the child. I do not fault

the government for prosecuting Wehrbein the second time. I do fault the government for

would have faced one traumatic separation from his father, and not two. In contrast, the government demands a sentence that requires Christopher to be taken from his father, reunited with his father, and taken from his father a second time, all with potentially devastating consequences to that disabled child. The Sentencing Guidelines do not to insulate the government from the consequences of its idleness, particularly where the result is harm to an exceptionally vulnerable child.

### The Factors Exist

It is, of course, one thing to identify potentially exceptional factors and quite another thing to decide that those factors are actually present as a matter of fact. I find as a matter of fact that the factors that I have previously identified do in fact exist. Although the government raises a number of arguments in this regard, I will address the five that merit a response.

First, the government suggests that I ought to believe Dr. Duffy and not Dr. Scalora. As I have said before, Scalora was more persuasive than Duffy because he spent more time on this assignment and because his opinions substantially tracked the earlier work of other psychologists while Duffy's did not. I also add that the government's refusal to agree to an independent expert suggests that the government recognized the weakness of its position.

Second, the government argues that the parents tried to skew the results. The government says that some of the responses for Christine and the defendant are similar or identical. I am unpersuaded by this argument for many reasons, but most importantly because the results of Scalora's testing insofar as Christopher is concerned are consistent with the testing done by other psychologists such as Dr. Renner in 1998 and Dr. Ferre in 1996. For example, Scalora saw Christopher as being in the top ten percent of at-risk children for internalizing difficulties like depression based upon information supplied by the parents, and Dr. Renner found that Christopher obtained elevations of greater than two standard deviations [12] from average in the areas of withdrawn behavior and social problems based upon testing administered to Christopher.

Third, the government argues that Christopher is now doing better and the impact of his father's second prison sentence will not be great. This is essentially repetitive of Dr. Duffy's analysis. While Christopher did better in the 1998–99 school year, this improvement took place when he was reunited with his father. Thus, the boy's improvement confirms Scalora's analysis rather than refuting it.

Moreover, it was Duffy who told me that Christopher had gotten better because "the stressors have been removed." (Tr. 203.) What the government proposes to do is reintroduce, in Duffy's words, the primary "stressor." Christopher thought about suicide and feared that his brother and sister were dead when his father was taken away the first time. There is no reason to think that such fears, and the resulting trauma, will not surface again should his father go to prison a second time, particularly now that Wehrbein has begun to act like a real parent and the government, through its inaction, has allowed the father to be reunited with the son.

Fourth, the government argues that Christopher will have his mother and his grandfather to fall back upon when his father goes to prison a second time. This argument simply ignores the facts. Nancy Probst, who had extensive experience with Christine, testified that Christine would likely relapse should she be confronted with the loss of her husband. If the wom-

---

prosecuting him so slowly with the resulting harm to an innocent child.

**12.** "Standard deviation" is a statistical method for judging whether things are occurring randomly. "For example, the probability of a result occurring within two standard deviations from the mean is 95.44%...." *Palmer v. Shultz,* 815 F.2d 84, 93 (D.C.Cir.1987).

an relapsed, she could provide no structure for Christopher, let alone the structure he needs. The government has no evidence to counter Probst's considered judgment based upon more than one year of work with Christine. Moreover, it is clear from Scalora's testimony that Christine, although well motivated, cannot provide the type of structure that Christopher needs. In fact, Christopher's improvement upon the return of his father supports Scalora's judgment. Finally, the grandparent who took Christopher the first time and kept him near his father in Nebraska has now left the state after the death of his wife. Thus, even if the grandfather were to take the boy a second time, it would result in the boy being removed far from his roots. This possibility was considered and rejected by the social workers when they kept the boy close to home in 1996, even though it meant separating the siblings. As a result, the grandfather is not a viable option either.

Fifth, the government argues that the support Christopher will receive from the school will be enough to protect the child should his father go to prison a second time. As noted earlier, I see merit in this argument insofar as Boyd III is concerned, but his difficulties are primarily cognitive and not emotional. Scalora testified that children, like Christopher, who have attention deficit hyperactivity disorder require a stable home environment and competent disciplinarians in order to function properly. I am convinced by the wisdom of this testimony, particularly since Christopher has only done well after the return of his father. For example, in the last semester of the 1997–1998 school year, Christopher obtained three D's, two C's and one F. Christopher's father was in prison until March of 1998. During the 1998–99 school year, when his father was reunited with the family and providing structure for the boy, the child obtained mostly A's and B's, except Cs in social studies and one C in reading. Consequently, it does not appear that the school system is the critical component of Christopher's progress and treatment. On the contrary, I am persuaded that the defendant is the pivotal link to Christopher's success.

### What the Guidelines Consider

While there are nine factors that justify this departure, those factors can be condensed into two broad categories. Those categories are: (1) harm to a child occasioned by the incarceration of his father; and (2) the dual prosecution of Wehrbein by the State of Nebraska and the federal government for very similar conduct arising out of the same event that in turn causes the child to suffer trauma twice rather than once because the United States was dilatory in the second prosecution.

U.S.S.G. § 5H1.6 tells us that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Therefore, the Guidelines discourage me from basing a departure on the harm to Christopher. Consequently, the harm to Christopher must exist to an exceptional degree for a departure to be justified on that ground. *Koon*, 518 U.S. at 96, 116 S.Ct. 2035.

The dual prosecution question is not mentioned in the Guidelines. Thus, I must consider the structure and theory of the individual guidelines and the Guidelines taken as a whole and decide whether the dual prosecution factor is sufficient to take the case out of the heartland. *Id.* (quoting *Rivera*, 994 F.2d at 949.) In so doing, I must bear in mind the Commission's expectation that departures based on a ground not mentioned in the Guidelines will be "highly infrequent." *Id.* (quoting 1995 U.S.S.G. Ch. 1, Pt. A.)

### The Factors Are Exceptional

In *Koon*, the Supreme Court made it clear that district courts have the best perspective to judge what is "exceptional" or "unusual" when it comes to Guidelines departures because the district courts do the sentencing and the great majority of sentences are never reviewed on appeal. *Koon*, 518 U.S. at 98–99, 116 S.Ct. 2035

(stating that the district court is "due substantial deference" because the "district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing"). In fact, only about six percent of the sentences are ever appealed. *Id.* at 98, 116 S.Ct. 2035.

When compared to all the federal courts in this nation, this court has a much greater than average criminal caseload. Administrative Office of the United States Courts, *1998 Federal Court Management Statistics* 118 (March, 1999) (compared to the other 93 district courts, the Nebraska criminal caseload ranks 17th highest). Of that caseload, nearly 50 percent of our criminal cases involve drug prosecutions, as compared with drug prosecutions amounting to about 40 percent of the criminal docket nationally. Memorandum to Chief Judges, United States District Courts, from Timothy McGrath, Interim Staff Director, United States Sentencing Commission (July 14, 1999) (Figure A—Guideline Defendants Sentenced by Primary Offense). Of the drug prosecutions in this district, 57 percent are methamphetamine trafficking cases, compared with 11 percent nationally. *Id.* Moreover, the average length of our sentences in drug trafficking cases (86.8 months) exceed by about ten percent the average national sentence (79.2 months) for drug trafficking cases. *Id.* at Table 7. Moreover, our downward departure rate for non-government departure motions (7.3%) is about half the national rate (13.6%). *Id.* at Table 8. Consequently, this court has a firm background against which to judge what is and what is not exceptional in cases like Wehrbein's.

Moreover, we have a consistent history of strictly applying the Guidelines, whether we agree with them or not. *See United States v. Petersen,* 25 F.Supp.2d 1021, 1025

(D.Neb.1998) (denying motion for downward departure for extraordinary family responsibilities; defendant's child had cystic fibrosis and defendant's medical insurance paid for child's care; no evidence that defendant's former wife was unable or unwilling to provide insurance), *aff'd,* 175 F.3d 1026 (8th Cir.1999) (table); *United States v. McMurray,* 833 F.Supp. 1454, 1458–59, 1472–73, 1485 (D.Neb.1993) (sentencing young, single mother of two, who was pregnant with a third child, and who had no criminal history, to life in prison because she participated in a large crack cocaine conspiracy), *aff'd,* 34 F.3d 1405 (8th Cir.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995).[13]

.With these points as an introduction, I address next the question of whether the reasons I have earlier given for departure are really exceptional. As noted, I have synthesized the nine factors into two broader categories for ease of analysis. One decides the "typicality" question by consulting the precedents and related authority in light of the words, structure and history of the Guidelines. Having done so, I am convinced that this case, insofar as it regards Christopher, is outside the heartland of cases because of the combination of these two circumstances.

First, the impact upon Christopher of a second incarceration of his father is exceptional because the boy has a severe emotional illness, he has been traumatized once already by a family separation and his father is the only one that can effectively provide the disturbed child with the disciplined and structured family support he needs to deal with his illness. *United States v. Haversat,* 22 F.3d 790, 797 (8th Cir.1994) (severe psychiatric illness of wife of antitrust defendant justified downward departure where doctor testified that the defendant's care was an irreplaceable part of treatment plan).

---

**13.** Six years later, the sentence was reduced to 12 years after the Commission made a Guideline change that required reduction of the sentence. *United States v. Hasan,* 41 F.Supp.2d 1004 (D.Neb.1999).

Unhappy with a 12–year sentence, the government has appealed, claiming that the young mother's sentence ought be no less than 27 years.

While not common, a number of courts have departed, or suggested that it is appropriate to depart, in very similar circumstances. *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999) (reconsideration of departure based on extraordinary family circumstances was warranted where defendant was a single mother of a 12–year old with learning problems; such reconsideration required a determination of whether child would suffer greater harm than normal child, what care would be available for child while defendant was in prison and whether professional assistance was available for the child) (Posner, C.J.); *United States v. DeRoover,* 36 F.Supp.2d 531, 532–33 (E.D.N.Y.1999) (granting 12–level departure and five-month prison sentence for single mother of five convicted of possession of about a kilogram of heroin based in large part upon the fact that elderly grandmother could not continue to care for the children and "[o]ne child suffers from 'separation anxiety' .... [and] has been under psychiatric observation") (Weinstein, J.); *United States v. Lane,* 790 F.Supp. 1063, 1064 (E.D.Wash.1992) (instead of imposing 33–month sentence in narcotics conspiracy, district court would depart downward to six months incarceration followed by six months of home detention where the defendant was a single mother of six children, defendant's relative would most likely be unable to care for the children, resulting in foster care placement, and "some of the children have exhibited social and school problems").

The courts have also granted substantial departures where the defendant was a male charged with a weapons or drug crime that was ordinary in nature, and where the wife, children or other family members were unusually dependent upon him. *United States v. Gauvin,* 173 F.3d 798, 806–08 (10th Cir.) (14–month departure in case involving assault on federal officer with a dangerous weapon; the defendant was a father and supporter of his wife and four young children; wife could barely support family, and she was in danger of losing custody of the children), *petition for cert. filed,* No. 99–5481 (July 23, 1999); *United States v. Owens,* 145 F.3d 923, 929 (7th Cir.1998) (affirming downward departure from imprisonment range of 168–210 months and imposing a sentence of 120 months in crack cocaine possession case; the defendant was primary support for wife and children; family would go on public assistance as a result of defendant's incarceration; defendant spent time every day with brother who suffered from Downs Syndrome); *United States v. Galante,* 111 F.3d 1029, 1035–36 (2nd Cir.1997) (approving 13–level downward departure in a drug case to time served (eight days) plus 24 months home detention for a defendant with two young children ages eight and nine; wife and children were uniquely dependent on the defendant because the wife was unable to speak English and could not support the family).

Many journal writers have also agreed that "family responsibility" departures are consistent with, and not contrary to, the Guidelines in cases similar to this one. *See, e.g.,* Jack B. Weinstein, *The Effect of Sentencing on Women, Men, the Family, and the Community,* 5 Colum.J. Gender & L. 169, 178 (1996) (a federal judge writes: "In certain cases, in view of the necessity of maintaining family stability in environments where father role models are few and far between, downward departures from the Guidelines and a search for alternatives to incarceration are a necessity for male defendants."); Jody L. King, *Avoiding Gender Bias in Downward Departures for Family Responsibilities Under the Federal Sentencing Guidelines,* 1996 Ann. Surv.Am.L. 273, 301 (1996) (suggesting that increased use of departures for family responsibilities is appropriate, but cautioning that "the decision to grant a downward departure for family responsibilities [should] turn[ ] on the need of the defendant's dependents"); Placido G. Gomez, *The Struggle Against Unwarranted Uniformity: The Evolution of Federal Sentencing Departures Based on Extraordinary Family Circumstances—The Case of Low–Level Drug Offenders,* 21 T. Marshall

L.Rev. 77, 90 (1995) (suggesting the use of alternative to incarceration in cases involving low-level drug offenders with extraordinary family responsibilities); Note, *The Sentencing Guidelines: Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities,* 76 Minn.L.Rev. 957, 982 (1992) (suggesting that the courts should decide what is "atypical" or "extraordinary" based upon factors relating to the dependents; among the proper considerations are "whether those children have special needs such as physical, emotional, or mental disabilities.")

Second, the government could have avoided, or lessened, the impact on the boy had it promptly prosecuted Wehrbein a second time, as opposed to ignoring the case for more than a year while Wehrbein completed his first prison sentence and was reunited with his son. As indicated earlier, the government's late prosecution of the boy's father, if it results in a second prison sentence, will cause the child to be unnecessarily traumatized twice rather than once; that is, the late prosecution deprived the father (and thus harmed the son by depriving the father) of the opportunity to admit his federal guilt and do his state and federal time back-to-back. The government's late prosecution thus threatens to cause the boy to unnecessarily suffer the injury of losing his father yet again. Therefore, the circumstances of this dual prosecution are extraordinary since the burden on this innocent boy is significant. *Koon,* 518 U.S. at 112, 116 S.Ct. 2035 (district court could depart based upon "[s]uccessive state and federal prosecutions" where the district court found that the defendants were " 'significantly burden[ed]' "). If anything, the circumstances in this case are stronger than in *Koon* since the substantial burden of the tardy second prosecution falls upon an innocent child.

### The Extent of the Departure is Reasonable

■ Any sentence I impose after departure must be reasonable. *Haversat,* 22

F.3d at 797. The sentence imposed in the case will be time served (13 days), three years of supervised release, with numerous conditions, including family and substance abuse counseling, 200 hours of community service and home confinement for six months under electronic monitoring at the defendant's costs. Keep in mind that the defendant has already served 13 months in state prison (after being sentenced to a maximum term of 31 months) for closely related conduct and that his federal imprisonment range before this departure was 27–33 months. The sentence I impose, amounting to an 8–level departure from total offense level 17 to total offense level 9, is consistent with other departure sentences in similar cases. *Owens,* 145 F.3d at 929 (departure amounting to 48 months from low end of the range); *Galante,* 111 F.3d at 1036 (13–level downward departure to time served (eight days) plus 24 months home detention); *DeRoover,* 36 F.Supp.2d at 532–33 (granting 12–level departure and five-month prison sentence); *Lane,* 790 F.Supp. at 1064 (from 33–month sentence, court departed downward to six months incarceration followed by six months of home detention). *Cf. Gauvin,* 173 F.3d at 806–08 (14–month departure).

In arriving at this sentence, I have thought about the goals of sentencing set forth in 18 U.S.C. § 3553(a) and have arrived at this sentence with those goals firmly in mind. I have also recognized that I must impose some confinement in all but the rarest of cases. *See Haversat,* 22 F.3d at 797 (affirming departure, but remanding because the district court did not impose any type of confinement, but simply fined the defendant). *See also United States v. Haversat,* 53 F.3d 335, 1995 WL 253173 (8th Cir.1995) (table) (on remand, the district court imposed a four-month sentence followed by four months of home confinement and the court of appeals affirmed), *cert. denied,* 516 U.S. 1027, 116 S.Ct. 671, 133 L.Ed.2d 521 (1995). The time served in federal custody amounting to 13 days, six months of home confinement while wearing an electronic bracelet

and the prior 13 months actually spent in state prison, considered in the context of the 31–month maximum state sentence, serves the ends of general deterrence. *Haversat*, 22 F.3d at 798.

But there is a much more profound question: why "should" Wehrbein's sentence be reduced because his child will suffer if he goes to prison a second time? *See Koon*, 518 U.S. at 115, 116 S.Ct. 2035 ("Thus, both Congress and the Commission envisioned that departures would require some unusual factual circumstance, but would be justified only if the factual difference '*should*' result in a different sentence.") (Souter, J., concurring in part and dissenting in part) (emphasis added). *See also* Note, *Exploring Collateral Consequences: Koon v. United States, Third Party Harm, and Departures from Federal Sentencing Guidelines*, 72 N.Y.U.L.Rev. 1462, 1487–88 (1997) (stressing the importance of answering Justice Souter's "should" question; suggesting that a departure sentence is warranted in an "extraordinary family effects" case where the collateral consequences to third parties are great and the effects of the defendant's criminal conduct are ordinary or usual).

After all, it was Wehrbein's conduct that ultimately caused his children to suffer (the first time). Am I not rewarding him for making and using drugs while fathering children? Is Wehrbein's plea for a departure like the defendant who murders his parents and then asks for mercy because he is an orphan? How do I square a departure sentence like this one with sentences I routinely impose on other drug dealers, some of them with children and others (thankfully) without offspring?

The reasons that a departure "should" be granted here are these:

(1) There are tangible costs to society (and real people like Christopher) when the government does not prosecute low-level drug dealers (like Wehrbein) promptly. For example, all of the work

that Nebraska social workers, teachers and consulting psychologists have invested in Christopher during and after Wehrbein's first prison sentence is threatened by the federal government's tardy prosecution of Wehrbein a second time.

(2) Those costs should be borne by prosecutors and law enforcement agencies rather than innocent children when the resulting third-party harm caused by their sloth is severe compared to the criminal conduct of an ordinary drug dealer like Wehrbein.[14]

In short, this sentence is warranted so as not to give the government an incentive to dawdle when charging low-level drug dealers and significantly harm innocents as a result.

## III. CONCLUSION

First, I will depart because the combined circumstances are exceptional as they regard the defendant's son, Christopher. I do so for two related reasons: (1) the impact upon Christopher of a second incarceration of his father is exceptional because Wehrbein is a low-level drug dealer, the boy has a severe emotional illness, he has been traumatized once already by a family separation and his father is the only one that can effectively provide the disturbed child with the disciplined and structured family support he needs to deal with his illness; (2) the government could have avoided, or lessened, the impact on the boy had it promptly prosecuted Wehrbein a second time, as opposed to ignoring the case for more than a year while Wehrbein completed his first prison sentence and was reunited with his son.

Second, while departing, this decision is "limited to its precise facts" and it is not an invitation to file departure motions "in the absence of truly exceptional family circumstances." *United States v. Galante*, 128 F.3d 788 (2nd Cir.1997) (en banc) (per

---

14. This, of course, means that the more serious the crime, the less likely a departure would be warranted. In other words, had Wehrbein been making five kilos of methamphetamine, rather than five grams, the result would probably be different.

curiam) (refusing to rehear panel decision on family-ties departure, but emphasizing the fact-specific nature of that question). If nothing else, the enormous effort that goes into trying to explain departures is enough to discourage even a strong-willed district judge from departing too frequently.

Finally, if I am wrong, the Court of Appeals, as it has done in the past, will correct me. That is as it should be, and I welcome appellate review if the parties think it appropriate to appeal. Respectfully, I urge only that we district judges actually be accorded the discretion that *Koon* contemplated. If I have abused that discretion, then I should be reversed. If not, and while other judges might reasonably make other choices if they faced a similar case, the departure should stand. That, after all, is what discretion is about.

IT IS ORDERED that the defendant's motion for departure (filing 45) is granted in part and denied in part.